# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | |
|---|---|
| JOSE MANUEL REQUENA and ) <br> OSCAR REQUENA, Individually and ) <br> On Behalf of the Estate of Maria Hernandez, ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **vs.** ) <br> ) <br> PILGRIM'S PRIDE CORPORATION, ) <br> ) <br> **Defendant** ) | Case No. 9:20-cv-00147-RC-ZJH |

## DEFENDANT PILGRIM'S PRIDE CORPORATION'S
## MOTION TO DISMISS AND BRIEF IN SUPPORT

Defendant Pilgrim's Pride Corporation ("Pilgrim's") moves the Court for an order dismissing Plaintiffs' claims with prejudice.  In support of this Motion to Dismiss ("Motion"), Pilgrim's states as follows:

### I.      Introduction

Plaintiffs' mother, Maria Hernandez, passed away on May 8, 2020.  Although Plaintiffs allege Ms. Hernandez died from complications associated with COVID-19 and seek to hold Pilgrim's liable, they have not stated cognizable claims against Pilgrim's.  Thus, the case should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

To succeed on their negligence claim, Plaintiffs must show Pilgrim's breached a duty it owed to Ms. Hernandez and that such breach caused Ms. Hernandez's death.  Without that breach and a causal connection between the breach and Ms. Hernandez's death, Plaintiffs cannot assert a viable negligence claim against Pilgrim's.  Yet, Plaintiffs have not pled any facts demonstrating the necessary breach of duty or causal link.  Thus, Plaintiffs' negligence claim should be dismissed.

Plaintiffs' gross negligence claim also fails because the allegations show Pilgrim's did not (1) engage in any activity that objectively involved an extreme degree of risk to Ms. Hernandez or (2) had actual knowledge that an extreme degree of risk existed but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Ms. Hernandez.  As a matter of law, asking Ms. Hernandez to work in the Shipping and Labeling department did not involve an extreme degree of risk.  Likewise, Plaintiffs fail to plead facts explaining how Pilgrim's proceeded with conscious indifference to the rights, safety, or welfare of Ms. Hernandez when Pilgrim's implemented numerous safety measures in response to COVID-19.  In fact, the Complaint does not address Pilgrim's safety measures at all, let alone attempt to explain why they were inadequate.

Alternatively, if Plaintiffs pleaded cognizable negligence and gross negligence claims, which Pilgrim's denies, Plaintiffs' claims are still not viable because the Defense Production Act of 1950 ("DPA") both preempts Plaintiffs' state tort claims under the Supremacy Clause and provides  immunity from liability under the circumstances of this case.  Faced with national meat shortages due to conflicting state and local laws operating to close or restrict the operations of meatpacking plants with COVID-19 outbreaks, the President signed into law Executive Order No. 13917 (the "Food Supply Executive Order").  With the Food Supply Executive Order, the President explicitly directed meat and poultry processors—like Pilgrim's—to continue operating during the national emergency caused by the COVID-19 pandemic so that Americans would have access to critical sources of protein.  The Executive Order federalized meatpacking worker protection, setting the Centers for Disease Control and Prevention's ("CDC") guidelines and the Occupational Safety and Health Administration ("OSHA") guidance as the governing standards for meat and poultry producers during the pandemic.  Plaintiffs' state-law tort claims are barred by the Supremacy Clause because, in these circumstances, state tort laws operate as an obstacle to

the enforcement of federal law and policy.  Likewise, under the DPA, Pilgrim's cannot "be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with" the Food Supply Executive Order.

Alternatively, this case should be dismissed or, at a minimum, stayed under the primary jurisdiction doctrine.  Plaintiffs' causes of action require a determination of whether, in what circumstances, and to what extent a poultry processing company like Pilgrim's can be held responsible if an employee allegedly contracts COVID-19 in the workplace and dies as a result of that infection.  Another federal district court in a COVID-19 case involving workers in a meat processing plant has already determined that the primary jurisdiction doctrine requires referral of these issues to OSHA because they fall squarely within the rubric of OSHA's special competence and mission of enforcing occupational safety and health standards.  In the event this Court does not dismiss Plaintiffs' claims, it should hold likewise.

Finally, Plaintiffs' request for exemplary damages should be dismissed because (1) Plaintiffs' only claim that would support such damages—gross negligence—should be dismissed for the reasons stated above and (2) Plaintiffs' demand for punitive damages is preempted by federal law.  Pursuant to President Trump's invocation of the DPA and subsequent agency directives, the federal government assumed exclusive authority to regulate meat and poultry processing facilities during the COVID-19 pandemic and, as such, the federal government is the sole authority that may sanction a poultry processor for the manner in which it responds to the risk of COVID-19 transmission while operating.  Because the federal government has completely preempted the field in which Plaintiffs seek to sanction and control Pilgrim's conduct and state law stands as an obstacle to federal policies and objectives, Plaintiffs' request for exemplary damages is preempted by federal law and should be dismissed.

## II.    Statement of the Issues

In accordance with Local Rule CV-7(a)(1), Pilgrim's identifies the following issues to be decided by the Court:

1.     Given Plaintiffs' failure to plead facts sufficient to show (1) breach of a duty to Ms. Hernandez, (2) that Pilgrim's caused Ms. Hernandez's death, (3) that Pilgrim's conduct involved an extreme degree of risk, or (4) that Pilgrim's acted in conscious indifference to the rights, safety, or welfare of Ms. Hernandez, should Plaintiffs' claims for negligence and gross negligence be dismissed under Rule 12(b)(6)?

2.     Considering the President's invocation of the DPA in the Food Supply Executive Order (Executive Order No. 13917) and the Order's recognition that poultry processors constitute critical infrastructure that must remain open and operational during the national emergency caused by the COVID-19 pandemic, (1) does the Supremacy Clause of the United States Constitution preempt Plaintiffs' claims or (2) does the DPA's immunity to liability provision in 50 U.S.C. § 4557 bar Plaintiffs' claims against Pilgrim's?

3.     If the Court does not dismiss Plaintiffs' claims for failure to state a claim, should it nevertheless dismiss or stay this case pursuant to the primary jurisdiction doctrine so that the case may be referred to OSHA to allow OSHA to employ its specialized knowledge and experience in determining whether Pilgrim's complied with OSHA guidance while continuing to operate in accordance with the Food Supply Executive Order (Executive Order No. 13917)?

4.     If the Court does not dismiss the case in its entirety, should it dismiss Plaintiffs' request for exemplary damages as a result of (1) Plaintiffs' failure to plead a viable claim for gross negligence and (2) the preemption of exemplary damages as a state law remedy by contrary federal law applicable to this case?

### III.     Factual Background

This lawsuit was filed by the sons of a deceased employee of Pilgrim's Lufkin poultry processing plant.  (*See generally* Plaintiffs' First Amended Complaint [ECF 14] ("Compl.").)  On May 8, 2020, Maria Hernandez passed-away.  (*Id.* ¶ 5.)  Her sons, Plaintiffs Jose Manuel Requena and Oscar Requena, claim Ms. Hernandez died "of complications related to COVID-19 . . ."  (*Id.*)

In an attempt to establish a link between Ms. Hernandez's employment at Pilgrim's Lufkin poultry processing plant and her death, Plaintiffs contend Ms. Hernandez was "instructed to report to work in the Shipping and Labeling department" of Pilgrim's meat processing facility "to fill in for Pilgrim's workers who were absent due to a COVID-19 outbreak."  (*Id.* ¶ 18.)  Plaintiffs also contend in conclusory fashion that the Shipping and Labeling department was "a hot spot in the Lufkin plant known to Pilgrim's management but not disclosed to line workers such as Ms. Hernandez."  (*Id.*)  Plaintiffs allege Pilgrim's committed negligence and gross negligence by sending Ms. Hernandez to work in the Shipping and Labeling department, supposedly without providing her adequate warnings or personal protective equipment ("PPE") and without taking reasonable steps to render the area safe.  (*Id.* ¶¶ 24-36.)  Plaintiffs also blame Pilgrim's for not shutting down the Lufkin meat processing facility completely like "other employers."  (*Id.* ¶ 9.)

Importantly, Plaintiffs do not allege Ms. Hernandez tested positive for COVID-19 on or before her last day at the Pilgrim's Lufkin meat processing plant—Monday, May 4, 2020.  (*Id.* ¶¶ 20, 22.)  Instead, the Complaint shows Ms. Hernandez did not visit a doctor or get tested for COVID-19 until a Pilgrim's nurse recommended she do so and after Ms. Hernandez left Pilgrim's for the last time.  (*See id.* ¶ 20.)

The lawsuit also does not allege Ms. Hernandez worked alongside any Pilgrim's employee infected with COVID-19, let alone any employee Pilgrim's knew to be infected with COVID-19.  (*See generally id.*)  Plaintiffs similarly fail to address the many safety precautions Pilgrim's

implemented in response to COVID-19 or explain how those precautions were inadequate.  (*See generally id.*)  In short, the Complaint relies entirely on conclusory allegations rather than facts that could support the causes of action Plaintiffs seek to assert.

## IV.     Argument and Authorities

### A.     The legal standard for dismissal under Rule 12(b)(6).

To avoid dismissal under Rule 12(b)(6), Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs' allegations must include sufficient facts to "nudge[] [their] claims across the line from conceivable to plausible." *Id.*

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, minimum pleading standards "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 677.  Instead, Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face," whose allegations are "enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

Although "a court must accept as true all of the allegations contained in a complaint," that principle is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.   In other words, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id*. (quoting *Twombly*, 550 U.S. at 557).

6

**B.      Plaintiffs cannot succeed on their negligence claim.**

To prove their negligence claim, Plaintiffs "must establish a duty, a breach of that duty, and damages proximately caused by the breach." *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006).  Here, Plaintiffs' allegations fail to satisfy the elements of their negligence claim.

**1.      Plaintiffs do not allege facts sufficient to show Pilgrim's breached any duty.**

Pilgrim's had only "a duty to use ordinary care in providing a safe workplace" for Ms. Hernandez.  *Id.*  But Plaintiffs seek to impose additional extraordinary duties on Pilgrim's.  (*See generally* Compl.)  Whether such duties exist "is a threshold inquiry and a question of law" and "liability cannot be imposed if no duty exists."  *Elwood*, 197 S.W.3d at 794.

Importantly, "an employer is not an insurer of its employees' safety," and an employer "owes no duty to warn of hazards that are commonly known or already appreciated by the employee."  *Id.*  The Texas Supreme Court has repeatedly reaffirmed this rule.  *See, e.g.*, *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 412 (Tex. 2009) (collecting and citing several cases for the proposition that "the employer 'owes no duty to warn of hazards that are commonly known or already appreciated by the employee'").  Moreover, employers are not strictly liable for employees' safety.  *Union Pac. R.R. Co. v. Nami*, 498 S.W.3d 890, 899 (Tex. 2016).  Despite these longstanding rules of black letter law, Plaintiffs seek to turn Pilgrim's into an insurer of Ms. Hernandez's safety and impose a duty to warn Ms. Hernandez about the well-known potential hazards associated with COVID-19.

Plaintiffs' allegations show no such warning was necessary because Ms. Hernandez already appreciated the risks associated with contracting COVID-19.  Plaintiffs admit Ms. Hernandez was "aware of the COVID-19 threat" and claim she engaged in social distancing based on her appreciation of the risk.  (Compl. ¶ 18.)  They also admit Texas Governor Greg Abbott "had declared a statewide emergency" due to COVID-19 by March 13, 2020—several weeks before

Ms. Hernandez went to work in the Shipping and Labeling department on or around April 23, 2020.  (*See id.* ¶¶ 5, 19.)  Under these circumstances, the Court should hold as a matter of law that Pilgrim's did not have a duty to warn Ms. Hernandez regarding the risks of COVID-19 because they were "already appreciated by the employee."  *Elwood*, 197 S.W.3d at 794.

Plaintiffs' theory of liability in this case is analogous to that rejected by the Texas Supreme Court in *Nami*.  In that case, a railroad employee who contracted West Nile virus from a mosquito bite tried to hold his employer strictly liable even though railroads—like other employers—are merely required "to provide their employees reasonably safe places to work."  *Nami*, 498 S.W.3d at 891.  The Court noted it was impossible to exclude mosquitos from the work site—just as it is impossible to completely exclude the COVID-19 virus from any location in the midst of a global pandemic.  Moreover, the "prevalence of mosquitoes in the Sweeny area was painfully obvious to all" and the "danger of mosquito-borne West Nile virus was well-known to the public."  *Id.* at 898.  Thus, the employer was not required to provide the additional safety measures suggested by the plaintiff.  *See id.* ("Mosquito repellent and long-sleeve shirts might have reduced the number of bites, but neither would have prevented infection, and Union Pacific was not obligated to provide either.").  In short, holding an employer liable under such circumstances would make it "strictly liable and an insurer of its employees' safety."  *Id.* at 899.  The same is true in this case.

In addition, Plaintiffs must show that a reasonable person would have acted differently from Pilgrim's.  *See id.* at 896 (under "fundamental common-law principles," "negligence means the failure to use ordinary care—failing to do what a reasonable person like the defendant would have done under the same or similar circumstances—to protect against unreasonable risk of harm").  Here, Plaintiffs include no allegations regarding the steps Pilgrim's took to prevent the spread of COVID-19; nor do they allege what *different* actions a reasonable person would have

taken.  (*See generally* Compl.)  Without such allegations, Plaintiffs cannot show Pilgrim's breached any duty to Ms. Hernandez or that Pilgrim's conduct caused Ms. Hernandez to contract COVID-19.  Accordingly, Plaintiffs cannot satisfy the elements of their negligence claim, and the Court should dismiss the claim with prejudice.  *See Elwood*, 197 S.W.3d at 794 (Plaintiffs "must establish a duty, a breach of that duty, and damages proximately caused by the breach.").

> **2.** **Plaintiffs do not allege facts showing that any conduct by Pilgrim's caused Ms. Hernandez's death.**

Plaintiffs also cannot satisfy the final element of their negligence claim—"damages proximately caused by the breach." *Elwood*, 197 S.W.3d at 794.  Plaintiffs' negligence claim is premised on the assumption that Ms. Hernandez contracted COVID-19 due to her employment at Pilgrim's Lufkin facility.  But Plaintiffs fail to allege facts showing a causal link between Ms. Hernandez's employment with Pilgrim's and her COVID-19 infection—*i.e.*, facts that would "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Plaintiffs' Complaint does not include any allegations about the manner in which Ms. Hernandez contracted COVID-19.  (*See generally* Compl.)  Instead, Plaintiffs added a conclusory allegation to their Amended Complaint stating Ms. Hernandez "was exposed to the virus" in the Shipping and Labeling department.  (*Id.* ¶ 31.)  But Plaintiffs fail to allege facts that would support a finding that COVID-19 was present in the Shipping and Labeling department when Ms. Hernandez was working there.  In short, Plaintiffs want the Court to *assume* Ms. Hernandez contracted COVID-19 through her employment with Pilgrim's because *other Pilgrim's employees* were diagnosed with COVID-19 at some point *before* Ms. Hernandez even worked in the department.  But the fact that other Pilgrim's employees also contracted COVID-19 does not show Ms. Hernandez was infected with COVID-19 by those employees or while she was working at Pilgrim's Lufkin chicken processing facility.

Plaintiffs' theory of causation in this case is analogous to the conspiracy theory that was rejected in *Twombly*.  *See* 550 U.S. at 555.  *Twombly* involved allegations of an antitrust conspiracy.  The Supreme Court held that "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.  Moreover, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice."  *Id.*  That is because parallel conduct, without more, does not show an agreement existed.  *Id.* at 556-57.

The same logic applies here.  For several months, COVID-19 has been spreading throughout Texas.  The fact that some employees at Pilgrim's Lufkin plant contracted COVID-19 while there was parallel spread in the community does not indicate any of those employees was infected with the disease at their place of employment.  Indeed, the parallel spread of COVID-19 within the larger community shows Pilgrim's employees could have contracted COVID-19 outside the workplace.  And even accepting as true Plaintiffs' allegation that a higher percentage of Pilgrim's Lufkin employees contracted COVID-19 than the general population (*see* Compl. ¶ 8), the Court nevertheless "must not allow evidence of temporal correlation to serve as a substitute for science-based causation evidence."  *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009).  Indeed, the Fifth Circuit and Supreme Court have said time and again that "correlation does not imply causation."  *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 202 (5th Cir. 2019).

Importantly, Plaintiffs do not allege Ms. Hernandez had contact with any Pilgrim's employee who was diagnosed with COVID-19, let alone that she had the sort of sustained contact at work that is likely to lead to transmission of the virus.  (Compl. ¶ 19.)  Instead, Plaintiffs rely on conclusory allegations devoid of factual enhancement—precisely the sort of allegations the Supreme Court held to be insufficient in *Iqbal*.  *See* 556 U.S. at 678.

Plaintiffs' allegations also show that employees who were sick or believed they may have had contact with COVID-19 stopped coming to work and went to get tested.  (*See id.* ¶ 13 ("According to a Pilgrim's employee, as reported in the Lufkin Daily News, the Shipping and Labeling department at Pilgrim's was consistently understaffed during the pandemic due to illness, employees being tested, or absenteeism.").)  Thus, Plaintiffs' allegations show Pilgrim's did *not* expose employees to COVID-19, negligently or otherwise.

To plead a viable claim for negligence, Plaintiffs must do more than speculate that Ms. Hernandez could have been infected with COVID-19 at her place of employment.  They must plead facts that, if taken as true, would allow a fact finder to determine that Ms. Hernandez actually contracted COVID-19 at work and as a result of Pilgrim's failure to comply with a legal duty. Because the Complaint does not include such allegations, Plaintiffs have not asserted facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Given Plaintiffs' failure to allege Ms. Hernandez had contact with any Pilgrim's employee who had COVID-19, the Complaint does not *plausibly* allege that Ms. Hernandez contracted COVID-19 at Pilgrim's Lufkin facility.  To "nudge[] [their] claims across the line from conceivable to plausible," Plaintiffs would have to allege Ms. Hernandez, her family, and anyone else with whom she had contact outside of work in the two or three weeks prior to her death, had no contact with a person infected with COVID-19, and instead that Ms. Hernandez's only exposure to COVID-19 occurred within the walls of Pilgrim's Lufkin plant. *Twombly*, 550 U.S. at 570.  But Plaintiffs do not make those allegations, and no amount of discovery will prove such a causal theory.  Instead, all Plaintiffs have alleged is the same sort of parallel conduct the United States Supreme Court found insufficient in *Twombly*.  *See* 550 U.S. at 570.  Thus, the Court should grant this Motion and dismiss Plaintiffs' negligence claim for lack of causation.

**C.      Plaintiffs' gross negligence claim is not viable.**

Plaintiffs must establish two elements to succeed on their gross negligence cause of action: "'(1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed[s] in conscious indifference to the rights, safety, or welfare of others.'" *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014). Plaintiffs cannot satisfy either element.

**1.      Plaintiffs' allegations do not constitute an objectively extreme degree of risk.**

Even assuming Ms. Hernandez contracted COVID-19 through her employment, Plaintiffs must still show that asking Ms. Hernandez to work in the Shipping and Labeling department constituted an objectively extreme degree of risk from Pilgrim's point of view to succeed on their gross negligence claim. *Boerjan*, 436 S.W.3d at 311. This objective element of gross negligence is "a function of both the magnitude and the probability of the potential injury" and cannot be satisfied if Pilgrim's alleged conduct "merely create[d] a remote possibility of serious injury." *Universal Servs. Co. v. Ung*, 904 S.W.2d 638, 641 (Tex. 1995). Instead, Pilgrim's alleged actions "must create the 'likelihood of serious injury' to the plaintiff." *Id.*

Conduct that is merely negligent also cannot support a claim for gross negligence. *See Medina v. Zuniga*, 593 S.W.3d 238, 249 (Tex. 2019) ("The objective gross-negligence standard must remain functionally distinguishable from ordinary negligence."). Instead, whether conduct objectively involves an extreme degree of risk "is 'a threshold *significantly higher* than the objective "reasonable person" test for negligence.'" *Id.* (emphasis added). Acts that are "'merely thoughtless, careless, or not inordinately risky cannot be grossly negligent.'" *Id.*

Plaintiffs' Complaint is bereft of allegations supporting the gross negligence claim. Plaintiffs allege in conclusory fashion that "Pilgrim's created an extreme risk of harm by failing

to adequately address the outbreak before sending additional workers from other departments into the Shipping and Labeling department." (Compl. ¶ 34.) But Plaintiffs do not allege what steps Pilgrim's should have taken in response to COVID-19 or address the steps Pilgrim's *did* take. (*See generally id.*) Without addressing those matters, Plaintiffs cannot show there was an objectively extreme degree of risk. *See Boerjan*, 436 S.W.3d at 311.

Importantly, the objective degree of risk must be judged "from the viewpoint of the defendant *at the time the events occurred*, without viewing the matter in hindsight." *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994) (emphasis added). Thus, the fact that serious injury ultimately occurs in a given case cannot prove there was a high level of risk that serious injury was *likely* to occur. That is because "the magnitude of the injury may be entirely disproportionate to the riskiness of the behavior." *Id.* Thus, the allegation that Ms. Hernandez passed away due to complications related to COVID-19 does not indicate Pilgrim's engaged in behavior that objectively involved an extreme degree of risk. *See id.* ("If somebody has suffered grave injury, it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no great danger.").

Here, Plaintiffs do not allege facts showing it was extremely risky for Pilgrim's to ask Ms. Hernandez to work in the Shipping and Labeling department. Plaintiffs do not allege Pilgrim's knew that any employee currently working in the department had COVID-19 or that any of the employees working in that department had been exposed to COVID-19 when Ms. Hernandez went to work there. Instead, Plaintiffs' Complaint impermissibly requires the Court to assume COVID-19 was present in the Shipping and Labeling department during the short time Ms. Hernandez was working there because employees *who were no longer working in that department* allegedly tested positive for the virus. *Twombly* precludes that assumption. *See* 550 U.S. at 555 ("Factual

allegations must be enough to raise a right to relief above the speculative level . . . .").  Thus, Plaintiffs cannot satisfy the first element of their gross negligence claim.

### 2. Plaintiffs fail to allege facts indicating Pilgrim's was consciously indifferent to a known risk.

In addition to showing the existence of an objectively extreme risk, Plaintiffs must prove Pilgrim's had "'actual, subjective awareness of the risk involved, but nevertheless proceed[ed] in conscious indifference to the rights, safety, or welfare of others'" to succeed on their claim for gross negligence.  *Boerjan*, 436 S.W.3d at 311.  Plaintiffs seemingly attempt to meet this burden by claiming "Pilgrim's was aware at all relevant times, and certainly no later than April 21, 2020, of the outbreak of COVID-19 in the Shipping and Labeling department of its Lufkin plant." (Compl. ¶ 34.)  But Plaintiffs other allegations prove Pilgrim's lacked the subjective awareness required.

Plaintiffs admit that employees in the Shipping and Labeling department who got sick stopped coming to work.  (*See id.* ¶ 13 ("the Shipping and Labeling department at Pilgrim's was consistently understaffed during the pandemic due to illness, employees being tested, or absenteeism").)  Moreover, even assuming other employees contracted COVID-19 while working in the Shipping and Labeling department—something Plaintiffs have not alleged and cannot prove—the fact that something happened in the past "as a matter of law is not sufficient to establish 'that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.'"  *Ung*, 904 S.W.2d at 642.  Thus, Plaintiffs cannot establish their gross negligence claim by relying on the fact that *other employees* supposedly contracted COVID-19 while working in the Shipping and Labeling department.  Plaintiffs' gross negligence cause of action should therefore be dismissed.

**D.      Plaintiffs' claims are barred by the Supremacy Clause and the DPA.**

**1.      The President invoked federal statutory law and articulated clear federal policy to secure and protect the nation's meat supply during the national emergency caused by COVID-19.**

Plaintiffs' claims should also be dismissed because they are preempted by the Food Supply Executive Order and related federal guidance invoking the DPA.  *See* U.S. Const. art. VI; Executive Order No. 13917, "Delegating Authority Under the Defense Production Act With Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19," 85 Fed. Reg. 26313 (Apr. 28, 2020).

Section 101(a) of the DPA authorizes the President "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense" when the President determines that certain circumstances are present.  50 U.S.C. § 4511(a).  The President invoked his statutory authority under the DPA with the Food Supply Executive Order by "find[ing] that meat and poultry in the food supply chain meet the criteria specified in section 101(b)" of the DPA.  85 Fed. Reg. 26313; *see also id*. ("The 2019 novel (new) coronavirus known as SARS-CoV-2, the virus causing outbreaks of the disease COVID-19, has significantly disrupted the lives of Americans.   In Proclamation 9994 of March 13, 2020 (Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak), I declared that the COVID-19 outbreak in the United States constituted a national emergency, beginning March 1, 2020.").

The Food Supply Executive Order recognized the importance of keeping poultry processing facilities open despite the risk that workers might be exposed to COVID-19.  *Id*.  It also noted that "recent actions in some States had led to the complete closure" of meat and poultry facilities, and "[s]uch actions" were potentially "inconsistent" with federal policy and the guidance provided by federal agencies.  *Id*.  That is because "[s]uch closures threaten the continued

functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency." *Id*. Thus, actions in the States were inconsistent with the CDC and OSHA interim guidance during a national emergency:

> *It is important that processors of beef, pork, and poultry ("meat and poultry") in the food supply chain continue operating* and fulfilling orders to ensure a continued supply of protein for Americans. However, outbreaks of COVID-19 among workers at some processing facilities have led to the reduction in some of those facilities' production capacity.  In addition, *recent actions in some States have led to the complete closure* of some large processing facilities.  *Such actions may differ from or be inconsistent with interim guidance recently issued by the Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor entitled "Meat and Poultry Processing Workers and Employers" providing for the safe operation of such facilities*.[1]

85 Fed. Reg. 26313 (emphasis added).  In short, the Food Supply Executive Order makes clear that, in light of the threat of the pandemic to the nation's meat supply, the CDC and OSHA will have sole authority to establish worker safety protocols applicable to meat and poultry producers.

The Food Supply Executive Order declares that "the national meat and poultry supply chain" is "critical infrastructure during the national emergency" caused by COVID-19 and notes that "closure of a single meat or poultry processing facility can severely disrupt the supply of protein to an entire grocery store chain." *Id.*  Consequently, the President—exercising his authority under the DPA—directed the Secretary of Agriculture to "take all appropriate action under [section 101(b) of the DPA] *to ensure that meat and poultry processors continue operations* consistent

---

[1]   CDC & OSHA, *Meat and Poultry Processing Workers and Employers*, (Apr. 26, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html.

with the guidance for their operations jointly issued by the CDC and OSHA."[2]  *Id.* (emphasis added).  The CDC and OSHA promulgated such guidance on April 26, 2020.

  **2.**    **The Food Supply Executive Order preempts any "obstacle" to its enforcement.**

Under the Supremacy Clause, where state tort laws serve "'as an obstacle to the accomplishment and execution of'" federal objectives, those laws are preempted.  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (citation omitted); *see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("state law is nullified to the extent it actually conflicts with federal law.  Such a conflict arises . . . when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  The Food Supply Executive Order "itself reflects a desire to subject the industry to a single, uniform set of federal safety standards"—here, federal regulations and guidance issued by the CDC and OSHA.  *Geier,* 529 U.S. at 871.

Preemption of state law may arise in a variety of circumstances, including when state and federal law conflict and state law provides "an obstacle" to achieving federal policies and objectives.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000).  State law is also preempted where it intrudes on an area exclusively regulated by the federal government.  *de la Cuesta*, 458 U.S. at 153 (observing that federal preemptive intent may be inferred from "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject") (internal quotation marks omitted).  Accordingly,

---

[2] On May 5, 2020, the Secretary for the United States Department of Agriculture ("USDA"), pursuant to President Trump's direction, issued a letter to meat processing companies "exhort[ing]" them to stay operational or resume operations and stating, "[e]ffective immediately, meat and poultry processing plants should utilize the guidance issued on Sunday, April 26, 2020, by the CDC and OSHA specific to the meat and poultry processing industry to implement practices and protocols for safeguarding the health of the workers and the community while staying operational or resuming operations."  (*See* U.S. Dep't of Agriculture, "Secretary Perdue Issues Letters on Meat Packing Expectations," May 6, 2020, *available at* https://www.usda.gov/media/press-releases/2020/05/06/secretary-perdue-issues-letters-meat-packing-expectations.)

courts routinely find that particular causes of action or specific remedies have been preempted when they intrude on the federal government's sphere of exclusive authority.

The primary purpose of the Food Supply Executive Order is to "ensure that meat and poultry processors *continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA*." 85 Fed. Reg. 26313 (emphasis added); *see also id.* (directing the Secretary of Agriculture "to determine the proper nationwide priorities and allocation of all the materials, services, and facilities necessary to *ensure the continued supply of meat and poultry*, consistent with the guidance for the operations of meat and poultry processing facilities jointly issued by the CDC and OSHA") (emphasis added). This explicit directive preempts *all* state tort claims that would impose rules or requirements other than the CDC and OSHA guidelines because "the rules of law that judges and juries create or apply in such suits may themselves similarly create uncertainty and even conflict, say, when different juries in different States reach different decisions on similar facts."[3] *Geier*, 529 U.S. at 871.

Because the Food Supply Executive Order and its implementing guidance have the same "force and effect given to a statute of Congress," Texas law is preempted in this case. *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir. 1967). As with the Executive Order considered in *Farkas*, the Food Supply Executive Order—which was issued pursuant to the DPA—was "issued pursuant to statutory authority and has the force and effect of law." *Id.* at 632 n.1. Thus, any rule of state tort law that stands "as an obstacle to the accomplishment and execution of the

---

[3] Likewise, the Food Supply Executive Order preempts Plaintiffs' specific allegations as they relate to Pilgrim's not temporarily closing the Lufkin facility. (*See* Compl. ¶ 9 (contending "Pilgrim's had refused to close down even temporarily for additional cleaning").) Plaintiffs also fail to explain what "additional cleaning" would require a temporary closure—allegations that are required for Plaintiffs to show that such a failure was negligent or grossly negligent. (*See id.*) As a meat processing facility, Pilgrim's already cleans and sanitizes the production area on a regular basis to ensure harmful bacteria and viruses do not enter the food supply chain. Plaintiffs do not explain why those cleaning measures were insufficient; nor do they address the additional cleaning measures Pilgrim's implemented in response to COVID-19. (*See generally id.*) Without such allegations, Plaintiffs cannot show that Pilgrim's was negligent or grossly negligent.

important means-related federal objectives" outlined therein "is pre-empted."  *Geier*, 529 U.S. at 881 (internal quotation marks omitted).  And here, the full purposes and objectives of federal law were to keep poultry processors like Pilgrim's running to provide food for the nation.

Adjudicating the merits of the Complaint under Texas's negligence and gross negligence laws—rather than applying federal law in accordance with the Food Supply Executive Order—would result in uncertainty throughout the country and could lead to a web of conflicting and contradictory rules as various states apply their own different tort laws when considering how to keep workers safe during the ongoing health emergency.  Therefore, this Court must decline to enforce Texas's tort regime against Pilgrim's.

Plaintiffs' own allegations that Pilgrim's violated Texas tort laws—*i.e.*, "the rule of state tort law" Plaintiffs' urge—demonstrate how this lawsuit stands as "an obstacle" to the federal goal of continued operation of meat and poultry plants.  *Geier*, 529 U.S. at 886.  For example, Plaintiffs claim the following allegations result in liability under Texas law:

- Pilgrim's "sen[t] [Ms. Hernandez] to a known hot spot for the virus." (Compl. ¶ 4);

- Pilgrim's "shifted workers . . . to fill in for workers who were absent" (*Id.*);

- "Ms. Hernandez was instructed to report to work in the Shipping and Labeling department" (*id.* ¶ 19);

- Pilgrim's allegedly created an extreme risk of harm by "sending additional workers from other departments into the Shipping and Labeling department" [4] (*id.* ¶ 34); and

---

[4] Shipping and labeling poultry products are, of course, necessary steps in the continued operation of Pilgrim's Lufkin poultry processing facility and are the subject of regulation under federal USDA agricultural law.  *See* 21 U.S.C. § 457(a) (the federal Poultry Products Inspection Act:  "All poultry products inspected at any official establishment under the authority of this Act and found to be not adulterated, shall at the time they leave the establishment bear, in distinctly legible form, on their shipping containers and immediate containers as the Secretary may require, the information required under paragraph (h) of section 4 of this Act.").  Indeed, federal regulations require certain information be included on the label, including "the name and the place of business of the manufacturer, packer, or distributor . . . and an accurate statement of the quantity of the product in terms of weight, measure, or numerical count . . . ."  21 U.S.C. § 453(h)(5).  *See generally* Poultry Products Inspection Act, available at https://www.fsis.usda.gov/wps/portal/fsis/topics/rulemaking/poultry-products-inspection-acts.

- Pilgrim "assign[ed] employees to areas where infected workers had been assigned" in the past (*id.* ¶ 35).

If such allegations can lead to liability under Texas law—*i.e.*, if Plaintiffs' claims for negligence and gross negligence are not dismissed for the reasons explained *supra*—then those allegations stand as an obstacle to the federal laws applicable to poultry producers under the Food Supply Executive Order, meaning the allegations are preempted under the Supremacy Clause. *See Geier*, 529 U.S. at 881 ("state tort law imposing such a duty . . . would have presented an obstacle to the variety and mix of devices the federal regulation sought"); *see also id*. at 871-72.

In sum, the CDC and OSHA guidelines are binding federal law for the operation of meat and poultry plants under the Food Supply Executive Order. Thus, the micromanagement of meat and poultry plants by various theories of state tort laws stands as "an obstacle" to the federal policy seeking the continued operation of the nation's meat supply and the application of uniform safety standards during the pandemic emergency. *See Geier*, 529 U.S. at 886 ("The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of that objective."). "Hence, [Plaintiffs'] tort action is pre-empted," and their claims should be dismissed. *Id.*

### 3.    Pilgrim's is immune from this suit as a matter of law under the DPA.

Because Pilgrim's Lufkin facility was operating in accordance with the Food Supply Executive Order and related federal guidance during a national emergency, the Court should hold that Plaintiffs' claims are barred by the DPA's immunity provision. Section 707 of the DPA provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or *order* issued pursuant to [the DPA], notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid." 50 U.S.C. § 4557 (emphasis added). Thus, Pilgrim's cannot be liable for operating in accordance with the Food Supply Executive Order.

As noted above, the Food Supply Executive Order commands poultry processors to operate "consistent with the guidance for their operations jointly issued by the CDC and OSHA." 85 Fed. Reg. 26313. Notably, the Complaint does not include any allegation that Pilgrim's failed to comply with the guidance issued by CDC and OSHA. (*See generally* Compl.) Nor do Plaintiffs contend Ms. Hernandez was infected with COVID-19 before the President issued the Food Supply Executive Order on April 28, 2020. (*See* Compl. ¶ 20 ("on Friday, May 1, Ms. Hernandez began experiencing COVID-19 symptoms").) Consequently, there are no allegations that Pilgrim's failed to comply with the Food Supply Executive Order, and Pilgrim's cannot "be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with" the Food Supply Executive Order and related federal regulations. 50 U.S.C. § 4557. The Court should, therefore, dismiss Plaintiffs' claims based on the DPA's immunity provision.

**E.   Plaintiffs' claims should be dismissed or the case stayed under the primary jurisdiction doctrine.**

To the extent the Court does not dismiss Plaintiffs' negligence and gross negligence causes of action for the reasons explained above, it should dismiss or stay this case pending a referral to OSHA pursuant to the doctrine of primary jurisdiction.

**1.   The primary jurisdiction doctrine allows agencies with special competence and experience to uniformly apply laws throughout the nation.**

Certain cases, although "cognizable in the courts," should be "referr[ed] . . . to the administrative body" that possesses "special competence" with respect to the issues underlying the claim. *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). As explained above, the Food Supply Executive Order recognized poultry producers like Pilgrim's as "critical infrastructure during the national emergency" caused by COVID-19 and sought to "ensure that meat and poultry processors continue operations *consistent with the guidance for their operations jointly issued by the CDC and OSHA*." 85 Fed. Reg. 26313 (emphasis added). Thus, OSHA is uniquely positioned

to interpret its own guidance for meat and poultry processors, and the Court should refer this case to OSHA in accordance with the doctrine of primary jurisdiction.

The primary jurisdiction doctrine is not "an abdication of judicial responsibility"; instead, it "allows a court when faced with an issue which calls into question an area of special expertise of an agency to suspend proceedings pending referral of the issue to the agency for its official position." *Am. Trucking Ass'ns, Inc. v. I. C. C.*, 682 F.2d 487, 491 (5th Cir. 1982). Similarly, referring "the issue to the administrative agency does not deprive the court of jurisdiction." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). Rather, the court "has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Id.* at 268-69. Here, the case should be dismissed because Plaintiffs will not suffer unfair disadvantage by having their claims dismissed while OSHA considers the matter. *Id.*

The Fifth Circuit has expressed a preference for referring cases like this one to administrative agencies under the primary jurisdiction doctrine. *See Am. Trucking Ass'ns*, 682 F.2d at 492 ("When faced with two roads diverging, one leading through the unmarked forest of judicial guesswork and one leading through the clearing of agency expertise, this Court has preferred to take the [road] less traveled by, that of primary jurisdiction."). And while there is no "fixed formula" for determining when the primary jurisdiction doctrine should be invoked, the Supreme Court has emphasized the desirability of obtaining uniform results by allowing "a specialized agency" to take the first pass at answering "certain types of administrative questions." *W. Pac. R. Co.*, 352 U.S. at 64. That is especially relevant here where the Food Supply Executive Order expressly calls on OSHA to issue guidance for the safe operation of meat and poultry processing facilities.[5]

---

[5] When issuing directions to meat processing facilities pursuant to the President's Food Supply Executive Order, USDA Secretary Sonny Perdue expressly recognized OSHA's "authority and expertise over public health and worker

### 2.      The primary jurisdiction doctrine was developed for situations like this case.

The Fifth Circuit has "recognized agency referral is favored when (a) it will promote even-handed treatment and uniformity in a highly regulated area, or when sporadic action by federal courts would disrupt an agency's delicate regulatory scheme; or (b) the agency possesses expertise in a specialized area with which the courts are relatively unfamiliar." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 811 (5th Cir. 2011). Both of those factors are satisfied here.

With respect to the first factor, several lawsuits have already been filed against meat and poultry processors and their employees alleging claims related to COVID-19 infection.[6] Invoking the primary jurisdiction doctrine in this case will promote even-handed treatment and uniformity in a highly regulated area and avoid possible inconsistent rulings as numerous courts throughout the nation attempt to navigate OSHA regulations in lawsuits involving employees of meat processing facilities. In addition, because COVID-19 is a new illness, courts are relatively unfamiliar with the virus and the new OSHA regulations related to meat and poultry processors. Thus, referral to OSHA also satisfies the second *Elam* factor.

Numerous Executive Branch pronouncements have made clear that federal authorities are making the policy decisions regarding how workplace safety should be balanced against the continued operation of meat processing plants as well as discretionary enforcement decisions concerning whether, when, and how to regulate compliance with that federally mandated balance. The most significant of these statements is the Food Supply Executive Order, which directed that

---

safety issues for plant employees" in relation to the COVID-19 pandemic. (*See* U.S. Dep't of Agriculture, "Secretary Perdue Issues Letters on Meat Packing Expectations," May 6, 2020, *available at* *https://www.usda.gov/media/press-releases/2020/05/06/secretary-perdue-issues-letters-meat-packing-expectations.*)

[6] *See, e.g.*, *Rural Cmty. Workers All. v. Smithfield Foods, Inc.*, No. 5:20-cv-06063, 2020 WL 2145350 (W.D. Mo. May 5, 2020); *Benjamin v. JBS S.A., et al.*, Civil Action No. 2:20-cv-02594 in the United States District Court for the Eastern District of Pennsylvania; *Buljic, et al. v. Tyson Foods, Inc., et al.*, Case No. 01071 LACV140521 (Black Hawk) in the District Court of Iowa, Judicial District 1B; *Garcia, et al. v. Guerrero, et al.*, Cause No. 20-61 in the 69th District Court of Moore County, Texas.

"the Secretary of Agriculture shall take all appropriate action under [the DPA] to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA."  85 Fed. Reg. 26313.  That same day, the Secretary of Agriculture declared that "USDA will work with meat processing [companies] to affirm they will operate in accordance with the CDC and OSHA guidance, and then work with state and local officials to *ensure that these plants are allowed to operate*."  (U.S. Dep't of Agriculture, "USDA to Implement President Trump's Executive Order on Meat and Poultry Processors," Apr. 28, 2020, *available at* https://www.usda.gov/media/press-releases/2020/04/28/usda-implement-president-trumps-executive-order-meat-and-poultry (emphasis added).)  As this statement underscores, it is federal agency actors who will liaise with both meat processing facilities and state and local officials in order to secure the Food Supply Executive Order's twin goals:  integrity of the nation's food supply and maintenance of reasonable working conditions at facilities.

Additional contemporaneous confirmation of the extent of federal agency control over these issues came in the form of a statement of enforcement policy from the Solicitor of Labor and the Principal Deputy Assistant Secretary of OSHA.  (*See* U.S. Dep't of Labor, Statement of Enforcement Policy by Solicitor of Labor Kate O'Scannlain and Principal Deputy Assistant Secretary for OSHA Loren Sweatt Regarding Meat and Poultry Processing Facilities, Apr. 28, 2020, *available at* https://www.dol.gov/newsroom/releases/osha/osha20200428-1.)    In that guidance document, the Department of Labor acknowledged that not all aspects of the guidance standards will be feasible for every facility and explained that OSHA therefore "*will use enforcement discretion* for employers adhering to appropriate guidance" and would "take into account good faith attempts to follow the Joint Meat Processing Guidance" if any investigative activities ensue.  (*Id.* (emphasis added).)

24

As these pronouncements show, the core issues in this case implicate both policy judgments and discretionary enforcement decisions that are squarely within the competence of OSHA (and its sister agencies) rather than the courts.  These factors thus weigh strongly in favor of referring the case to OSHA.  Indeed, another federal court faced with claims against a meat processor related to COVID-19 has already invoked the doctrine of primary jurisdiction and referred the case to OSHA.  *See Rural Cmty. Workers All. v. Smithfield Foods, Inc.*, No. 5:20-cv-06063, 2020 WL 2145350 (W.D. Mo. May 5, 2020).[7]

Like this lawsuit, the *Smithfield Foods* case involved allegations that a meat processor "failed to adequately protect workers at its meat processing plant . . . from the virus that causes COVID-19."  *Id.* at *1.  There, the court decided the plaintiffs' claims "succeed or fail on the determination of whether the Plant is complying with the Joint Guidance" titled "Meat and Poultry Processing Workers and Employers – Interim Guidance" issued by the CDC and OSHA ("the Joint Guidance").  *Id.* at *8.  The court held that "OSHA (in coordination with the USDA per the Executive Order) is better positioned to make this determination than the Court is" and that the "determination goes to the heart of OSHA's special competence:  its mission includes 'enforcing' occupational safety and health standards."  *Id.*  This Court should reach the same conclusion.

As in *Smithfield Foods*, OSHA is already involved in this case.  OSHA sent Pilgrim's a letter dated May 14, 2020 "requesting that [Pilgrim's] investigate the death of Ms. Maria Hernandez" and "provide, no later than May 21, 2020, the results of [Pilgrim's] investigation."[8] (*See* Ex. 2 at 2; *cf. Smithfield Foods*, 2020 WL 2145350, at *2 ("On April 22, OSHA sent

---

[7] A copy of the *Smithfield Foods* opinion is attached hereto as Exhibit 1 for the Court's convenience.

[8] When considering whether to exercise subject matter jurisdiction or dismiss this case and refer it to OSHA, the Court may consider evidence outside the pleadings.  *Cf. Flores v. Pompeo*, 936 F.3d 273, 276 (5th Cir. 2019) ("A district court may dispose of a motion to dismiss for lack of subject matter jurisdiction based 'on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'").

Smithfield a 'Rapid Response Investigation' requesting information regarding its COVID-19 work practices and infection at the Milan Plant, giving Smithfield seven days to respond.").)   Like Smithfield, Pilgrim's responded to OSHA.  (*See* Ex. 3.)  Thus, "OSHA has already shown interest in determining whether [Pilgrim's] is abiding by the Joint Guidance."  *Smithfield Foods*, 2020 WL 2145350, at *8; *see also* Ex. 2 at 3 ("**If we do not receive a response from you by May 21, 2020, outlining investigative results and actions taken to comply with OSHA/CDC guidance, an OSHA inspection may be conducted.**").  Because "OSHA has already requested information about the Plant's safety measures," it is in the best position to determine whether Pilgrim's is complying with the Joint Guidance.  *Smithfield Foods*, 2020 WL 2145350, at *8.

The risk of inconsistent rulings also weighs strongly in favor of referring the case to OSHA.  As Plaintiffs note, Pilgrim's "operates in 14 states across the United States" and produces nearly 20% of the chicken in the United States.  (Compl. ¶ 10.)  If the Court refuses a primary jurisdiction referral here, Pilgrim's could be subject to conflicting judicial determinations regarding the adequacy of its COVID-19 mitigation efforts and the efforts of its various poultry processing facilities to comply with the Joint Guidance.  Indeed, this risk of inconsistent rulings was another reason the *Smithfield Foods* court referred that case to OSHA.  *See Smithfield Foods*, 2020 WL 2145350, at *8 ("only deference to OSHA/USDA will ensure uniform national enforcement of the Joint Guidance").  As in *Smithfield Foods*, "any determination by this Court whether the Plant is complying with the Joint Guidance could easily lead to inconsistent regulation of businesses in the same industry."  *Id.*  And because "the guidelines are rapidly evolving, maintaining a uniform source for guidance and enforcement is crucial."  *Id.*

Referring this case to OSHA serves all the goals the primary jurisdiction doctrine is meant to achieve.  Such a referral "will promote even-handed treatment and uniformity in a highly

regulated area" and prevent "sporadic action by federal courts [from] disrupt[ing] an agency's delicate regulatory scheme." *Elam*, 635 F.3d at 811.  Moreover, OSHA "possesses expertise in a specialized area with which the courts are relatively unfamiliar." *Id.*  Thus, the Court should dismiss Plaintiffs' claims and refer the matter to OSHA under the doctrine of primary jurisdiction.

**F.     Plaintiffs' request for exemplary damages should also be dismissed.**

Although Plaintiffs do not expressly request exemplary damages, they seek "all damages recoverable under Texas law" related to their asserted claims.  (Compl. ¶ 39.)  Exemplary damages are potentially recoverable under Texas law if Plaintiffs prove "by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from . . . gross negligence."  Tex. Civ. Prac. & Rem. Code Ann. § 41.003.  Because Plaintiffs attempt to assert a cause of action for gross negligence, they appear to be seeking exemplary damages related to that claim.

**1.     Because Plaintiffs' claim for gross negligence is not viable, Plaintiffs cannot recover exemplary damages.**

Plaintiffs' request for exemplary damages should be dismissed because Plaintiffs are not entitled to such damages under the circumstances of this case.  Plaintiffs do not allege fraud or malice.  Thus, the only claim Plaintiffs attempt to assert that would allow for the recovery of exemplary damages is their gross negligence claim.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (limiting the recovery of exemplary damages to harm that "results from:  (1) fraud; (2) malice; or (3) gross negligence.").  Because that claim should be dismissed for the reasons explained above, Plaintiffs' request for exemplary damages should also be dismissed.

**2.     Plaintiffs' request for exemplary damages is preempted by federal law.**

Plaintiffs' request for exemplary damages should also be dismissed because it is preempted by federal law.  Plaintiffs seek to use Texas tort law regarding gross negligence to punish and deter

the allegedly wrongful operations of a poultry processing business during a national emergency. In this situation, Texas law must yield to federal regulations because federal regulations govern the specific conduct at issue and displace the standard regime of sanctions that might otherwise be available under state law.

Even if the Court does not hold that Plaintiffs' claims have been preempted by the Food Supply Executive Order and related federal pronouncements in their entirety, the Court should still hold that Plaintiffs' request for exemplary damages under Texas law has been preempted by federal law.  Punitive damages function as "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974). Thus, federal courts have found punitive damages preempted where the imposition of such damages would operate as a *state* regulating—*i.e.*, punishing and/or deterring—conduct that is subject only to *federal* control.  *See, e.g.*, *Pitts By & Through Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351, 358 (5th Cir. 1991) (ERISA preempted state law claim for punitive damages).

Here, federal agencies are using their authority under the DPA and the Food Supply Executive Order "to achieve a somewhat delicate balance of statutory objectives" related to meat processing companies.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001). Allowing state-law regulation (here, punitive damages) would "skew[]" the federal government's ability to achieve its desired balance between (1) ensuring the safe operation of domestic meat processing facilities and (2) protecting the integrity of the nation's food supply.  *Id.*

Plaintiffs' demand for exemplary damages based on Pilgrim's supposed failure to mitigate the risk of COVID-19 transmission at a poultry processing plant inevitably intrudes on the USDA's exclusive authority to regulate the conduct of meat processors during a national emergency and would threaten the fulfillment of the USDA's mandate to "ensure that meat and poultry processors

continue operations." 85 Fed. Reg. 26313. Thus, the Court should reject Plaintiffs' request to impose exemplary damages on Pilgrim's based on Pilgrim's operation of a meat processing facility during this national emergency. (*See generally* Compl.)

The Food Supply Executive Order does not permit the sort of state-law second-guessing Plaintiffs seek in this case. Instead, it empowers the USDA to "take all appropriate action" under the DPA to "ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." 85 Fed. Reg. 26313. In turn, the DPA grants the federal government exclusive enforcement authority and control over "all litigation" arising under the statute or attendant regulations. 50 U.S.C. § 4556(b).

To the extent Texas law allows Plaintiffs to pursue a claim for gross negligence and recover exemplary damages against Pilgrim's while Pilgrim's was complying with the Food Supply Executive Order, there is a direct conflict between federal regulations and Texas law. Under such circumstances, the federal interest in regulating a manufacturer's compliance with the DPA overrides a given state's interest in regulating companies within its borders. *See Pitts*, 931 F.2d at 358 (ERISA precluded state law claim for punitive damages).

Although Texas may generally allow for the recovery of exemplary damages in cases of gross negligence, the federal government's specifically articulated rules for the operation of meat processing facilities during the COVID-19 pandemic outweighs and displaces the State's interest. Accordingly, Plaintiffs' claim for exemplary damages should be dismissed.

## V.    Conclusion

For all the reasons explained above, Pilgrim's respectfully requests that Plaintiffs' claims be dismissed with prejudice. Pilgrim's also requests all other and further relief to which it is entitled either at law or in equity.

Dated:  September 8, 2020.

Respectfully submitted,

/s/ *Clayton E. Bailey*
Clayton E. Bailey, Lead Attorney
Texas State Bar No. 00796151
Benjamin L. Stewart
Texas State Bar No. 24046917

**BAILEY BRAUER PLLC**
Campbell Centre I
8350 N. Central Expressway, Suite 650
Dallas, Texas 75206
(214) 360-7433
(214) 360-7435 (fax)
cbailey@baileybrauer.com
bstewart@baileybrauer.com

**ATTORNEYS FOR DEFENDANT
PILGRIM'S PRIDE CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically on September 8, 2020.  As such, this document was served on all counsel of record who are deemed to have consented to electronic service, including Plaintiffs' counsel identified below:

Jim Hart, Esq.
William Langley, Esq.
Williams Hart Boundas Easterby, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5001

George Chandler, Esq.
P.O. Box 340
Lufkin, Texas 75902-0340

/s/ *Clayton E. Bailey*
Counsel for Pilgrim's Pride Corporation