IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| JOSE MANUEL REQUENA and OSCAR REQUENA, Individually and on Behalf of the Estate of Maria Hernandez,<br><br>  Plaintiffs,<br><br>v.<br><br>PILGRIM'S PRIDE CORPORATION,<br><br>  Defendant. | CASE NO. 9:20-CV-00147-ZJH |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and order of the District Court, this matter is before the undersigned Magistrate Judge for all proceedings and entry of judgment in accordance with the consent of the parties. Pending before the court is Defendant Pilgrim's Pride Corporation's *Motion for Summary Judgment*. Doc. No. 70.

This is one of the first cases alleging workplace exposure to COVID-19. In June of 2020, Plaintiffs Jose and Oscar Requena filed this lawsuit individually and on behalf of the estate of their mother, Maria Hernandez. They alleged that Pilgrim's negligently exposed Hernandez to COVID-19 while she worked at one of Pilgrim's poultry-processing plants in April of that year. Days after Hernandez tested positive, she tragically passed away.

A year after the Requenas filed suit, the Texas Legislature passed the Pandemic Liability Protection Act ("PLPA"), which establishes how an employer may be liable for exposing its employee to COVID-19. Because the Requenas have not produced evidence that satisfies some of the PLPA's elements, the court grants Pilgrim's Pride's Motion for Summary Judgment.

I. **Factual Background**

A. **Hernandez's Job at the Plant**

For decades, Maria Hernandez worked at Pilgrim's Pride Corporation's poultry-processing plant in Lufkin, Angelina County, Texas.  Freeman Dep. 7:22–8:8, Doc. No. 73-5 at 4.  In April of 2020, as the first COVID-19 cases were appearing in Angelina County, Hernandez worked at the plant's "Second Processing" line packing chicken parts onto trays for future delivery.[1]  *Texas COVID-19 Data, Cumulative Confirmed Cases over Time by County*, TEXAS HEALTH AND HUMAN SERVICES (March 28, 2022, 10:26 AM), https://www.dshs.state.tx.us/coronavirus/additionaldata/; Freeman Dep. 9:1–11:10, Doc. No. 73-5 at 4-5.  On about April 23, 2020, though, one of Hernandez's supervisors told her to report to the "28 Cooler" area.  Freeman Dep. 13:14-24, Doc. No. 73-5 at 5.  Although Hernandez's coworker testified that Hernandez objected to reporting to the 28 Cooler, she reported anyway because she would be disciplined if she didn't follow directions.[2]  Freeman Dep. 14:5-7, Doc. No. 73-5 at 6; J. Requena Dep. 78:22-24, Doc. No. 73-3 at 21.  Hernandez worked in the 28 Cooler anywhere from one to eight days.[3]

The 28 Cooler was the first of three areas in "Third Processing," which was downstream from Hernandez's usual tray-packing post.  Dempsey Dep. 174:17, Doc. No. 73-7 at 46.  Named because its temperature was twenty-eight degrees Fahrenheit, the 28 Cooler served as a staging

---

[1] At this point, the product had already passed through the "First Processing" area where the chickens were killed, eviscerated, and inspected.  Olade Dep. 24:23–25:17, 26:18-20, Doc. No. 73-6 at 8, 9.

[2] To be sure, Jose Requena testified that she was not "concerned" about reporting to the 28 Cooler.  J. Requena Dep. 27:2-8, Doc. No. 73-3 at 8.  Viewing the facts most favorably to Hernandez, though, the court finds that she objected to reporting to that area.

[3] Hernandez's coworker, one of four employees—including Hernandez—assigned to the 28 Cooler on the same day, testified: "*I* was told to work in there for the shift that *I* was there for the day."  Freeman Dep. 22:23-25, 23:12-15, Doc. No. 73-5 at 8 (emphasis added).  But there is no evidence that shows how many days Hernandez herself worked there.  She worked at the plant "the entire week of April 27, 2020" and then reported to its on-site nurse on May 4, 2020.  Doc. No. 73-29 at 2; *see* Doc. No. 71-22.  Therefore, if she worked Saturday, April 25, 2020 and the following five-day week in the 28 Cooler, she could have worked there a maximum of eight days.  *See* J. Requena Dep. 36:17-21, Doc. No. 73-3 at 10 (stating that the plant was closed on Sundays).

area where workers retrieved the packed chicken from Second Processing, stored it on racks, then, when it was ready, placed it on a conveyor belt traveling through a hole in a wall to the Labeling Department.  Olade Dep. 101:18-25, Doc. No. 73-6 at 27; Freeman Dep. 100:11-13, Doc. No. 73-5 at 27.  Hernandez's specific role in the 28 Cooler was to make sure the chicken was placed on that conveyor belt correctly.  Freeman Dep. 48:3-4, Doc. No. 73-5 at 14.  Once the chicken passed into the Labeling Department, other workers labeled it and placed it back on the conveyor belt through another hole in the wall to its final destination, the Shipping Department.  Olade Dep. 25:22-25, Doc. No. 73-6 at 8; Dempsey Dep. 177:4-8, Doc. No. 73-7 at 46.

Collectively, the 28 Cooler, the Labeling Department, and the Shipping Department comprised "Third Processing," but employees sometimes referred to all three areas as "shipping and labeling."  Aguilar Dep. 36:9-11, 36:21, 37:5-9, 39:3-6, Doc. No. 73-8 at 11, 12.  And while each area was walled off and "named differently," they were somewhat "connected."  Freeman Dep. 18:22-24, Doc. No. 73-5 at 7.  Specifically, between the 28 Cooler and the Labeling Department, there were eight wall openings for product to move through and one doorless archway for foot traffic.  Dempsey Dep. 177:9-19, 178:1-4, Doc. No. 73-7 at 46, 47.  Employees passed through the archway "all day long" to move racks between rooms, access the bathroom, and "mingle" with each other.  Dempsey Dep. 178:11-21, Doc. No. 73-7 at 47; Freeman Dep. 49:2-10, Doc. No. 73-5 at 14.

### B.  The 28 Cooler's COVID-19 Presence

Pilgrim's sent Hernandez into the 28 Cooler on April 23, 2020.  Freeman Dep. 13:14-24, Doc. No. 73-5 at 5.  On that day, that area had no confirmed COVID-19 cases.  Doc. No. 71-14 at 2, 4, 6.  There were, however, two employees on "monitor" status after they were designated "close contacts."  *Id*. at 4, 6.  Further, Pilgrim's sent Hernandez there two days after a 28 Cooler employee

3

tested for COVID-19 and one day before he received a positive result. *Id*. at 6. In addition, during the period Hernandez possibly worked there, six more 28 Cooler employees took tests, with two returning negative results (the evidence does not reveal the other four workers' results). *Id*. at 10-13. Pilgrim's also sent home a 28 Cooler employee because of close contact with a positive case. *Id*. at 10.

The situation in the rest of Third Processing was worse. Between April 16 and May 4, there were twenty-five tests and eleven positive results in the Labeling Department. *Id*. at 3-6, 8-13. Three of those employees tested positive on or before the day Pilgrim's sent Hernandez to the 28 Cooler. *Id*. at 4, 6, 8. There were also another thirteen close contacts. *Id*. at 4-6, 10. During the same period in the Shipping Department, one employee tested positive on the day Pilgrim's sent Hernandez to the 28 Cooler, two more tested positive shortly afterward, and an additional five were close contacts. *Id*. at 6, 9, 10. Combining the 28 Cooler, the Labeling Department, and the Shipping Department, the fifteen confirmed cases in Third Processing accounted for 44% of total cases at the plant between April 20 and May 5. *Id*. at 2-6, 8-13. For context, the entire county reported just fifty-four cases on May 5. *Texas COVID-19 Data*, TEXAS HEALTH AND HUMAN SERVICES. Anecdotally, Hernandez's coworker described "shipping and labeling" as where "people were getting sick" and the 28 Cooler as containing "most of the cases" at the plant. Freeman Dep. 50:25–51:2, 103:20–104:5, Doc. No. 73-5 at 15, 28.

### C. Safety Measures That Pilgrim's Enacted

Pilgrim's implemented several COVID-19 protocols before Hernandez tested positive. When counting attendance, it allowed certain vulnerable employees to stay home and receive short-term disability benefits. Doc. No. 71-15 at 2. It also didn't discipline workers who stayed home because of COVID-19 concerns. Fernandez Dep. 55:10–56:4, Doc. No. 71-3 at 4-5. As for

on-site disease prevention, when employees entered the plant, Pilgrim's checked their temperatures using infrared cameras and provided touchless-entry turnstiles.  Olade Dep. 47:17–48:1, 84:10-21, Doc. No. 73-6 at 14, 23.  Pilgrim's also required workers returning from a leave of absence to answer screening questionnaires before resuming work.  Doc. No. 73-29 at 2.  Once inside the plant, workers sprayed KC690 disinfectant and kept doors propped open to avoid surface-to-surface transmission.  Dempsey Dep. 82:12-20, Doc. No. 73-7 at 23; Olade Dep. 84:19–85:3, Doc. No. 73-6 at 23.  To keep workers socially distanced, Pilgrim's added outdoor tables for additional break space and erected physical barriers between work stations and breakroom tables.  Olade Dep. 85:4-10, 85:24–86:6, Doc. No. 73-6 at 23-24.   And to track the potential spread of COVID-19, the Occupational Health Manager kept a spreadsheet that noted close contacts and positive results (among other things).  Aguilar Dep. 9:2-6, 72:8-17, Doc. No. 73-8 at 4, 20.  The spreadsheet, however, was an internal document only: Because Pilgrim's was implementing assorted measures to combat COVID-19, it felt it was unnecessary to share infection numbers with its workforce.  Dempsey Dep. 137:2-6, Doc. No. 73-7 at 36.

Pilgrim's enacted several other measures to combat the threat of COVID-19, but it's unclear whether this happened before or after Hernandez tested positive.[4]  To start, the plant banned all visitors.  Doc. No. 71-17 at 6.  To encourage social distancing, it staggered start and break times (Doc. No. 71-16 at 2), placed traffic-flow markers throughout the facility (Olade Dep. 87:16-25, Doc. No. 73-6 at 24; Doc. No. 73-29 at 3), drew circles on the floor marking six feet of separation (Olade Dep. 89:10-16, Doc. No. 73-6 at 24; Doc. No. 73-29 at 3), removed every other chair in the break room (Doc. No. 73-29 at 3), erected tents and then permanent outdoor structures

---

[4] Pilgrim's produced a bullet-point list of several COVID-19 protocols organized by date implemented.  Doc. No. 71-21.  But because the list itself is unauthored and undated, the court will not consider the listed dates as undisputed facts.

for extra break space (Doc. No. 71-16 at 2; Dempsey Dep. 151:24–152:2, Doc. No. 73-7 at 40), and constructed temporary plastic dividers between work stations (Dempsey Dep. 168:4-13, Doc. No. 71-1 at 18).  To keep workers informed, it sent text updates to its staff when an employee tested positive (Dempsey Dep. 71:6-20, Doc. No. 73-7 at 20) and posted multilingual signage about COVID-19 management (Olade Dep. 91:4-10, Doc. No. 73-6 at 25; Doc. No. 73-29 at 3).  To prevent disease spread, Pilgrim's instructed employees to wash their hands and wiped down hand railings in the 28 Cooler specifically.  Aguilar Dep. 25:13-17, Doc. No. 73-8 at 8; Dempsey Dep. 184:20–185:1, Doc. No. 73-7 at 48.  To combat active spread, Pilgrim's sent symptomatic workers to OHS or required them to stay home.  Dempsey Dep. 64:24–65:4, Doc. No. 71-1 at 7-8; Doc. No. 71-17 at 5.  After workers took COVID-19 tests, Pilgrim's kept them away from the plant until the results were known.  Dempsey Dep. 88:15-19, Doc. No. 71-1 at 9.  And when workers did test positive, Pilgrim's asked them about their close contacts and monitored those contacts for symptoms.  Aguilar Dep. 61:4-12, Doc. No. 71-4 at 4.  Monitoring close contacts for symptoms, however, contravened the company's official "Decision Tree," which mandated that all close contacts—even those who were asymptomatic—quarantine or go home.  Doc. No. 73-15 at 4-5.

Some protocols weren't enacted until after Hernandez tested positive.  Pilgrim's didn't require masks until "months" after April 20, 2020, when it distributed them to its workers.  Freeman Dep. 30:24–32:16, Doc. No. 73-5 at 10; J. Requena Dep. 27:17-21, Doc. No. 73-3 at 8; Doc. No. 73-14 at 2-3.  Pilgrim's eventually upgraded the plastic barriers between work stations with permanent, stainless-steel structures.  Dempsey Dep. 168:18-22, Doc. No. 71-1 at 18.  It also conducted on-site testing—with the help of the National Guard at first and then using its own random "surveillance" testing.  Dempsey Dep. 125:3-14, Doc. No. 73-7 at 33; Dempsey Dep.

217:19–218:2, Doc. No. 73-7 at 56-57.  As for information, it provided a Spanish-language COVID-19 training course.  Doc. No. 73-12 at 2-3.  Finally, it hired a full-time "COVID-19 Superintendent" to ensure compliance with the company's policies and the Center for Disease Control's standards.  Doc. No. 73-29 at 3; Olade Dep. 90:18–91:3, Doc. No. 73-6 at 25.

But some protocols were either ineffective or unenforced.  The plastic barriers between work stations—which were the only barriers (if any) erected during Hernandez's tenure—"kept falling down."  Freeman Dep. 86:16-20, Doc. No. 73-5 at 24.  Further, the plant didn't follow its own staggard schedule, enforce distancing at lunch, or check whether workers were properly wearing masks.  Freeman Dep. 83:10-13, 84:22–85:3, 84:9-12, Doc. No. 73-5 at 23.  And as of April 29, 2020, on-site thermometers didn't work.  Doc. No. 73-13 at 2-3.

**D. Hernandez's Activities Outside of Work**

Two days after Pilgrim's sent Hernandez into the 28 Cooler, she spent time with her niece, Mary Duron.  Duron Dep. 18:7-10, 21:1-14, Doc. No. 73-22 at 6, 7.  The two attended a "drive-through" wedding shower, which meant they drove together to someone's house, dropped off a gift, then took a box of food to go.  Duron Dep. 18:7-16, Doc. No. 73-22 at 6.  This lasted about thirty minutes.  Duron Dep. 19:10-19, Doc. No. 73-22 at 6.  Afterwards they went back to Hernandez's house, where they ate together and talked for an undetermined amount of time.  Duron Dep. 19:23–20:8, Doc. No. 73-22 at 6.  Hernandez and Duron were close, so they greeted each other with hugs throughout this interaction.  Duron Dep. 20:14-17, Doc. No. 73-22 at 6.  Seven days after that, Duron had a headache and took a COVID-19 test.  Duron Dep. 10:19–11:9, Doc. No. 73-22 at 4.  It came back positive a few days later.  Duron Dep. 11:11-14, Doc. No. 73-22 at 4.

Duron testified that Hernandez didn't go out very often because she wasn't very sociable. Duron Dep. 28:20-23, Doc. No. 73-22 at 8. Jose Requena agreed, testifying that she didn't attend social gatherings. J. Requena Dep. 30:11-20, Doc. No. 73-3 at 9. After her church shut down the third week of March 2020, Jose testified that she went nowhere but work and home on a regular basis. J. Requena Dep. 77:3-11, Doc. No. 73-3 at 21. But her neighbor testified that, on a day around the time Duron tested positive, "many" people gathered at Hernandez's house with up to twelve cars parked outside. Doc. No. 71-23 at 3-4. The Requenas have not disputed this. O. Requena Dep. 32:4-6, Doc. No. 71-8 at 6.

### E. Hernandez Contracts COVID-19 and Passes Away

On Friday, May 1, 2020—eight days after working her first (and possibly only) day in the 28 Cooler and six days after eating lunch with Duron—Hernandez started coughing, feeling fatigued, and experiencing diarrhea. J. Requena Dep. 35:22–36:4, Doc. No. 73-3 at 10. She called in sick to work the next day. J. Requena Dep. 36:17-19, Doc. No. 73-3 at 10. On Monday, May 4, 2020, she went to work but reported to the nurse after an hour or so. J. Requena Dep. 36:22–37:4, Doc. No. 73-3 at 10-11; Doc. No. 71-22 at 2-3. That day, she took a COVID-19 test, which returned a positive result two days later. Doc. No. 73-28 at 3. On May 8, 2020, only two days after receiving the positive result, Hernandez passed away. Doc. No. 73-28 at 3. It was her sixty-fourth birthday. J. Requena Dep. 21:18–22:11, Doc. No. 73-3 at 7.

## II.   Procedural Background

On June 9, 2020, the Requenas sued Pilgrim's in state court for negligence and gross negligence. Doc. No. 4. They alleged that Pilgrim's sent Hernandez into a "known 'hot spot' for COVID-19 without warning or adequate protection and without taking reasonable steps to render the area safe." *Id*. at 7. On July 2, 2020, Pilgrim's removed the case to this court based upon

diversity jurisdiction. Doc. No. 1. Pilgrim's later filed a motion to dismiss, which the court denied on April 1, 2021. Doc. No. 38. On October 12, 2021, Pilgrim's filed a second *Motion to Dismiss* in response to the Texas Legislature's enactment of the PLPA. Doc. No. 44. Similarly, on December 16, 2021, Pilgrim's filed its *Motion for Judgment on the Pleadings*. Doc. No. 61. Finally, on January 14, 2022, Pilgrim's filed the pending *Motion for Summary Judgment*. Doc. No. 70. In its motion, Pilgrim's argues that Hernandez didn't actually die of COVID-19, the Requenas haven't satisfied the elements of the PLPA, and the Poultry Products Inspection Act ("PPIA") preempts their claims. Additionally, each party has filed several motions to strike its opponent's experts.

### III. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material when it is relevant or necessary to the ultimate outcome of the case. *Id.* The moving party has the burden of demonstrating that there are no genuine issues of material fact in dispute. *See Celotex Corp.*, 477 U.S. at 323; *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 433 (5th Cir. 2005). The court resolves any doubts and draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986); *United States ex rel. Longhi v. United States*, 575 F.3d 458, 465 (5th Cir. 2009).

The movant must support its assertion by "citing to particular parts or materials in the record . . . showing that the materials cited do not establish the . . . presence of a genuine dispute, or [showing] that the adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56 (c)(1)(A)-(B). "[T]he court . . . may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255.

If the movant satisfies its burden, the burden then shifts to the nonmoving party to show that specific facts exist over which there is a genuine dispute or to rebut the charge that the movant is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex,* 477 U.S. at 325). Like the movant, the nonmovant must satisfy its burden through specific citations to the summary judgment evidence. *See* FED. R. CIV. P. 56(c)(1); *Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment." *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)) (internal quotations omitted).

Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). As a result, "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012) (quoting *Harvill v. Westward Commc'ns, LLC, et al.*, 433 F.3d 428, 433 (5th Cir. 2005)). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the nonmoving party

fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322.

**IV.     Discussion**

    **A. The Requenas have created a fact dispute that Hernandez died of COVID-19.**

As a threshold matter, Pilgrim's attempts to cast doubt on whether Hernandez actually died of COVID-19. Doc. No. 70 at 13; Doc. No. 77 at 4-5. While her body was cremated without an autopsy, her death certificate unmistakably lists the cause of death as "complications of COVID-19." Doc. No. 73-26 at 2. "A copy of a birth, death, or fetal death record registered under this title *that is certified by the state registrar* is prima facie evidence of the facts stated in the record." Tex. Health & Safety Code Ann. § 191.052 (emphasis added); *see also Tex. Workers' Comp. Comm'n v. Wausau Underwriters Ins.*, 127 S.W.3d 50, 59-60 (Tex. App.—Austin 2003, no pet.). The Requenas have submitted a Texas Department of State Health Services Vital Statistics Certificate of Death that is signed by the state registrar. Doc. No. 73-26 at 2. Accordingly, the Requenas have created a fact dispute that Hernandez died of COVID-19.

    **B. The Requenas have failed to satisfy the PLPA's elements.**

Likely anticipating a deluge of negligence cases just like this, the Texas Legislature passed the Pandemic Liability Protection Act on June 14, 2021. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003. Although the Requenas filed suit back on June 9, 2020, the PLPA applies retroactively to actions commenced on or after March 13, 2020 that did not reach final judgment by June 14, 2021. Liability for Certain Claims Arising During a Pandemic or Disaster Related to a Pandemic, 87th Leg., R.S., ch. 528, § 5(a), 2021 Tex. Sess. Law Serv. 1058, 1064 (codified at Tex. Civ. Prac. & Rem. Code Ann. § 148.001); *see* Doc. No. 4. The PLPA shields people and corporations from

liability if an individual suffered "injury or death caused by exposing [the] individual to a pandemic disease during a pandemic emergency." Tex. Civ. Prac. & Rem. Code Ann. § 148.003. To recover from Pilgrim's for Hernandez's death, the Requenas must establish that Pilgrim's:

> (A) knowingly failed to warn Hernandez of or remediate a condition that Pilgrim's knew was likely to result in Hernandez's exposure to COVID-19, provided that Pilgrim's:
> > (i) had control over the condition;
> > (ii) knew that Hernandez was more likely than not to come into contact with the condition; and
> > (iii) had a reasonable opportunity and ability to remediate the condition or warn Hernandez of the condition before Hernandez came into contact with the condition; *or*
>
> (B) knowingly failed to implement or comply with government-promulgated standards, guidance, or protocols intended to lower the likelihood of exposure to COVID-19 that were applicable to Pilgrim's or its business, provided that:
> > (i) Pilgrim's had a reasonable opportunity and ability to implement or comply with the standards, guidance, or protocols;
> > (ii) Pilgrim's refused to implement or comply with or acted with flagrant disregard of the standards, guidance, or protocols; and
> > (iii) the government-promulgated standards, guidance, or protocols that Pilgrim's failed to implement or comply with did not, on the date that Hernandez was exposed to the disease, conflict with government-promulgated standards, guidance, or protocols that Pilgrim's implemented or complied with. *See id* (emphasis added).

The Requenas must also establish that:

> reliable scientific evidence shows that the failure to warn Hernandez of the condition, remediate the condition, or implement or comply with the government-promulgated standards, guidance, or protocols was the cause in fact of Hernandez contracting COVID-19. *See id*.

So, in sum, the Requenas must establish that (1) Pilgrim's either knowingly failed to remediate or warn Hernandez of a condition that Pilgrim's knew would likely expose her to COVID-19 *or* knowingly flouted government-promulgated COVID-19 guidance that was

12

applicable to the company *and* (2) reliable scientific evidence shows that the plant's conduct was the cause-in-fact of Hernandez's death. *See Fields v. Tyson Foods, Inc.*, No. 6:20-CV-00475, 2021 WL 4302836, at *3 (E.D. Tex. Sept. 22, 2021) (emphasis added).

    1.  <u>The Requenas have not satisfied some of the elements of the failure-to-warn-of-or-remediate prong.</u>

The Requenas' first route toward holding Pilgrim's liable is to show that the company knowingly failed to warn Hernandez of or remediate the presence of COVID-19. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003(a)(1)(A). In addition, the Requenas must show that Pilgrim's had control over the presence of COVID-19, knew Hernandez was more likely than not to come into contact with it, and had a reasonable opportunity and ability to either warn her of or remediate the presence. *See id*.

First, there is evidence that Pilgrim's knowingly failed to warn Hernandez about the concentration of COVID-19 in Third Processing. From April 20, 2020 (three days before Hernandez entered the 28 Cooler) until May 5, 2020 (the day after she took the COVID-19 test), the fifteen confirmed cases in Third Processing accounted for 44% of total cases at the plant. Doc. No. 71-14 at 2-6, 8-13. The plant's spreadsheet recorded all this data, but Pilgrim's felt it was unnecessary to share infection numbers with its workforce. Dempsey Dep. 137:2-6, Doc. No. 73-7 at 36. Further, besides close contacts, Pilgrim's didn't inform workers in Third Processing when a positive test occurred. Aguilar Dep. 95:16-23, Doc. No. 73-8 at 26. Instead, workers learned by "word of mouth" that "shipping and labeling" was where "people were getting sick." Freeman Dep. 20:3-9, 50:25–51:2, Doc. No. 73-5 at 7, 15. Since management failed to convey this information, there is sufficient evidence that Pilgrim's knowingly failed to warn Hernandez about

the concentration of COVID-19 in Third Processing.[5] *See* Freeman Dep. 20:3-9, Doc. No. 73-5 at 7.

Second, there's little debate that Pilgrim's had control over the 28 Cooler's COVID-19 presence. The parties didn't bother to even brief this issue. Pilgrim's controlled the 28 Cooler's temperature, workforce size, and safety procedures. It could have theoretically shut down the entire department to stop the spread of COVID-19 there. Pilgrim's therefore had control over the 28 Cooler's COVID-19 presence.

Third, though, the Requenas have not shown that Pilgrim's knew Hernandez was "more likely than not" to come into contact with virus. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003(a)(1)(A)(ii). The Requenas' expert, Dr. Andreas Handel,[6] testified that the plant's temperature and concentration of people made it "risky" that Hernandez would be exposed to the virus there, but he fell short of calling the chance of exposure "more likely than not." Handel Dep. 195:16–196:24, Doc. No. 71-10 at 14-15. He concluded that it was "more likely" Hernandez contracted COVID-19 at the plant than somewhere else, but he could not give an absolute percentage. Handel Dep. 196:14–197:6, Doc. No. 71-10 at 15-16. In fact, the "focus" of Dr. Handel's report was "*comparing* the risk of infection in the workplace setting with the risk of infection outside the workplace." Doc. No. 73-31 at 3 (emphasis added). Focusing on relative risk misses the point: The statute requires that it was "more likely than not" that Hernandez was exposed to COVID-19 at the plant. Put differently, the Requenas must show that there was a

---

[5] Pilgrim's argues that it warned Hernandez "that the virus could spread among individuals and that she should practice social distancing and wear a mask." Def.'s Mot. Summ. J. 20, Doc. No. 70 at 20. But its cited evidence is merely a Power Point explaining how to wear a mask, social distance, and properly wash hands; the slideshow contains no information about the concentration of COVID-19 in the 28 Cooler specifically. *See* Doc. No. 71-12. And more importantly, there's no evidence that Pilgrim's even shared the slideshow with Hernandez. *See* Olade Dep. 34:20–36:18, Doc. No. 73-6 at 11.

[6] The court is aware that each party has filed several pending motions to strike evidence from its opponent's expert and lay witnesses, including experts cited to in this order. Doc. Nos. 44, 50, 52, 57, 58, 59, 66, 76. Any ruling on those objections, however, would not affect the outcome of this order.

14

greater than fifty-percent chance of exposure there (and that Pilgrim's knew it). Even though Dr. Handel concluded that it was thirty-three times more likely that she contracted COVID-19 in the workplace than outside, that still doesn't answer whether there was a greater than fifty-percent chance of exposure at the plant or in the 28 Cooler specifically. *See id*. at 6. There were fifteen confirmed cases in Third Processing between April 20 and May 5, but without knowing the total number workers in Third Processing at any time, an absolute probability cannot be calculated. *See* Doc. No. 71-14 at 2-6, 8-13. And because there is no evidence that the exposure risk exceeded fifty percent, by extension, there also isn't evidence that Pilgrim's *knew* it exceeded fifty percent. Pilgrim's certainly tracked its COVID-19 data, but that doesn't equate to knowledge of a "likely" chance of exposure. Accordingly, the Requenas have not satisfied the elements of the failure-to-warn-of-or-remediate prong.[7]

        2. The Requenas have satisfied the elements of the failure-to-implement-or-comply-with prong.

The Requenas' second route toward holding Pilgrim's liable is to show that the company had a reasonable opportunity and ability to implement or comply with applicable government-promulgated standards meant to lower the likelihood of COVID-19 exposure but knowingly refused to do so. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003(a)(1)(B). The Requenas must also show that the refused standards did not conflict with standards that Pilgrim's *did* comply with or implement. *See id.* § 148.003(a)(1)(B)(iii).

Pilgrim's had a reasonable opportunity and ability to implement or comply with government-promulgated standards meant to lower the likelihood of COVID-19 exposure, and the

---

[7] For good measure, the Requenas have satisfied the last element of this prong: Pilgrim's had a reasonable opportunity and ability to warn Hernandez about the 28 Cooler's COVID-19 presence. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003(a)(1)(A)(iii). Since Pilgrim's tracked employees' test results and close contacts, it easily could have shared that information with Hernandez.

15

standards were applicable to the plant. Pilgrim's told its workforce that it was following CDC standards, so it must have had the opportunity and ability to implement them. *See* Doc. No. 71-17 at 4. Further, the plant's operations manager relied on the corporate office to monitor and communicate to him those latest standards. Dempsey Dep. 106:19–107:1, 205:1-8, Doc. No. 73-7 at 29, 53. And since Pilgrim's did successfully implement several measures to combat COVID-19, it certainly had the ability to do so. Taken together, the plant had the opportunity and ability to implement or comply with applicable CDC standards.

Most importantly, sufficient evidence shows that Pilgrim's knowingly refused to implement or comply with (or acted with flagrant disregard of) CDC standards. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003(a)(1)(B)(ii). To be sure, Pilgrim's enacted several safety measures as described earlier in the Factual Background section. And Dr. Handel testified that Pilgrim's was taking *some* steps to enforce CDC standards, which is far short of outright refusal or flagrant disregard. Handel Dep. 185:13-20, Doc. No. 71-10 at 12. Further, the operations manager testified that if workers congregated too closely to each other, he would remind them to keep their distance (although he never saw anything "rampant"). Dempsey Dep. 209:13-18, 210:24–211:8, Doc. No. 73-7 at 54, 55. But Hernandez's coworker testified that Pilgrim's "ignored" distancing policies by failing to break up closely congregated groups in the lunchroom or stagger start and break times.[8] Freeman Dep. 34:24–35:1, 83:10-13, 84:22–85:3, Doc. No. 73-5 at 10, 23. This is enough to create a fact dispute at the summary judgment stage. Accordingly,

---

[8] Hernandez's coworker also testified that Pilgrim's failed to enforce its mask mandate, leading to limited mask-wearing. Freeman Dep. 32:13–33:19, Doc. No. 73-5 at 10. As of April 6, 2020, however, the World Health Organization had advised that "medical masks should be reserved for health care workers," and current evidence didn't exist to make a recommendation for or against the use of nonmedical masks. *Advice on the use of masks in the context of COVID-19, Interim guidance, 6 April 2020*, WORLD HEALTH ORGANIZATION (April 28, 2022, 11:27 AM), https://apps.who.int/iris/bitstream/handle/10665/331693/WHO-2019-nCov-IPC_Masks-2020.3-eng.pdf?sequence=1&isAllowed=y.

the Requenas have met their burden to show that Pilgrim's knowingly refused to implement or comply with CDC standards.

Rounding out the failure-to-implement-or-comply-with prong, there's no evidence that Pilgrim's failed to implement social-distancing standards only because they conflicted with other standards that Pilgrim's *did* implement. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003(a)(1)(B)(iii). This part of the statute's text is slightly confusing; it's not clear which party has the burden to prove that the non-implemented standards conflicted with any implemented standards. But reason dictates that this subsection functions as an affirmative defense. Once an employee establishes that her employer had a reasonable opportunity to implement or comply with applicable government-promulgated standards meant to lower the likelihood of disease exposure but knowingly refused to do so, the burden then shifts to the employer to show that it failed to implement the standards only because they conflicted with standards that it did implement. Here, Pilgrim's has not produced any evidence of such a conflict. Accordingly, the Requenas have satisfied the elements of the failure-to-implement-or-comply-with prong.

> 3. <u>The Requenas have not established that reliable scientific evidence shows that a failure to warn Hernandez of or remediate the presence of COVID-19 or the failure to implement or comply with government-promulgated standards was the cause in fact of Hernandez contracting COVID-19.</u>

The Requenas have created a fact dispute that Hernandez died of COVID-19, and they have shown that Pilgrim's knowingly refused to implement or comply with CDC standards meant to prevent COVID-19 exposure. But that does not end the inquiry. To hold Pilgrim's liable, the Requenas must also establish that reliable scientific evidence shows that a failure to warn of or remediate the presence of COVID-19 or the failure to implement or comply with CDC standards was the *cause in fact* of Hernandez contracting COVID-19. *See* Tex. Civ. Prac. & Rem. Code Ann. § 148.003(a)(2) (emphasis added). To that end, the Requenas must go beyond showing that

17

Hernandez contracted COVID-19 at the plant: They must show that her exposure was the direct result of the plant's deficient policies.

Dr. Handel's report concluded that (1) it was "almost certain" that Hernandez contracted COVID-19 at work, (2) Pilgrim's inadequately implemented and enforced its risk-mitigation protocols, and (3) Pilgrim's did not implement sufficient measures to minimize Hernandez's specific exposure risk. Doc. No. 73-31 at 8. He reasoned that prolonged contact with coworkers in close work spaces, cold temperatures, and Hernandez's age combined to make it thirty-three times more likely that she contracted COVID-19 inside the plant than outside. *Id*. at 5-8. He also criticized the plant's virus-combatting methods generally and for Hernandez specifically. *Id*. at 7-8. None of these conclusions, however, amounts to evidence that the plant's alleged failures caused her death.

When asked whether the plant's failure to warn Hernandez of COVID-19's threat was the cause in fact of Hernandez's death, Dr. Handel bluntly stated: "I don't think one can make a conclusion of that." Handel Dep. 205:21-24, Doc. No. 71-10 at 20. He reasoned that "you can never fully predict" causation for "any individual person" in these scenarios. Handel Dep. 206:21-23, Doc. No. 71-10 at 21. While reliable scientific evidence could show that the plant's failure to remediate the presence of COVID-19 was the cause in fact of virus exposure on a "population" or "aggregate" level, he stated that randomness "always" prevented that conclusion on the individual level. Handel Dep. 206:2-23, Doc. No. 71-10 at 21. For instance, he testified that there were probably many people in Hernandez's shoes who avoided the virus "by luck," while there were others who caught it despite a proper warning. Handel Dep. 204:23–205:2, Doc. No. 71-10 at 19-20.

Dr. Handel also said that tying the plant's failure to implement or comply with government-promulgated standards to Hernandez's specific exposure made "no sense." Handel Dep. 206:24–207:5, Doc. No. 71-10 at 21-22. Dr. Handel could "only talk in probabilities"—had the plant implemented or complied with effective anti-COVID-19 measures, Hernandez's chance of avoiding the virus would have been reduced, "but it might have not been zero." Handel Dep. 207:15–208:3, Doc. No. 71-10 at 22-23. This falls short of establishing causation-in-fact. Accordingly, the Requenas have failed to establish that reliable scientific evidence shows that the plant's failure to warn Hernandez of or remediate the presence of COVID-19 or its failure to implement or comply with government-promulgated standards was the cause in fact of Hernandez contracting the disease. They therefore have not satisfied some of the elements of the PLPA.

### C. Whether the Poultry Products Inspection Act preempts the Requenas' claims is moot.

Finally, the parties disagree whether the PPIA preempts the Requenas' state-law claims for negligence for workplace COVID-19 exposure. The Fifth Circuit has not spoken on this issue, and there isn't a clear answer within this District. *Compare Fields*, 2021 WL 4302836, at *3 ("Plaintiffs' tort claims would . . . impose requirements 'in addition to' those authorized and promulgated under the PPIA and are preempted by that federal law."), *with Glenn v. Tyson Foods, Inc.*, 554 F.Supp.3d 858, 865 (E.D. Tex. 2021) ("Because nothing in the statutory language or in the structure and purpose of the PPIA suggest[s] an intent for the PPIA to preempt state common-law workplace safety claims such as this one, the PPIA does not provide a colorable federal defense."). Regardless of the answer, the result here is the same. PPIA preemption would "independently foreclose" the Requenas' claims. *See Fields*, 2021 WL 4302836, at *4. Without PPIA preemption, the Requenas must satisfy the elements of the PLPA, which they haven't. Accordingly, the court dismisses the Requenas' claims regardless of PPIA preemption.

## V. Conclusion

In sum, Plaintiffs Jose and Oscar Requena have not established that Pilgrim's knew Hernandez was more likely than not to come into contact with COVID-19, but there is sufficient evidence that Pilgrim's knowingly failed to warn her of it or remediate its threat. They have also produced evidence that Pilgrim's knowingly refused to implement or comply with applicable government-promulgated COVID-19 standards. But since the Requenas have not established that reliable scientific evidence shows that the plant's failure to implement or comply with those standards—or the plant's failure to warn of or remediate the presence of COVID-19—was the cause in fact of Hernandez contracting the virus, they have not satisfied some of the elements of the PLPA.

It is therefore **ORDERED** that Defendant Pilgrim's Pride Corporation's *Motion for Summary Judgment* (Doc. No. 70) is **GRANTED**. The court will enter a Final Judgment separately.

SIGNED this 22nd day of April, 2022.

_____
Zack Hawthorn
United States Magistrate Judge